Madden, Judge,
dissenting in part:
I do not agree with the court’s conclusion that the plaintiff may recover the tax, penalty, and interest assessed and paid for the year 1944. That conclusion means that the court is not satisfied that the plaintiff did not have, at the beginning of the 1944 tax year, approximately $20,0,000 in assets. If he did have that amount, then the Commissioner *10 of Internal Eevenue’s determination that bis net worth increased during 1944 by an amount which justified the assessment made, was wrong. The court does not, of course, decide that it was wrong. It only decides that it has not been proved that it was right. This result is reached because, the normal period of the statute of limitations having elapsed before the 1944 deficiency was assessed, the Government had the burden of proving that the plaintiff’s return for 1944 understated his proper tax by at least 25 percent.
I think the plaintiff has not given us all the evidence that he could have given us about his assets and his income. It seems incredible that a person who was carrying on a successful business, who, in addition, had substantial commercial and savings bank accounts and a considerable quantity of bonds, notes, and stocks, could not, if he would, tell us what else he had and where he had it. Vague and indefinite statements about prodigious quantities of money in jars, money belts and pockets, with no real explanation as to how or when the money got there, or why it was removed from those receptacles and placed where other people place their valuables, during the tax years in question, do not ring true. The net result may be that the plaintiff, merely by keeping silent and saying to the tax authorities, “You have the burden of proof; I am the only one who knows the facts and I won’t tell you,” has his Government at his mercy.
I think the burden which is on the Government when it attempts to apply Section 275(c) of the Internal Revenue Code is the burden of going forward with the evidence. This it did by showing what assets the plaintiff had at the beginning of the 1944 year, in those places where people ordinarily keep their assets. Then the plaintiff could, of course, show that he had other assets which he kept in unusual places. Instead of showing that, he tells us a vague story about total assets of $400,000, most of which were not to be found in places where valuables are ordinarily kept. If the court had believed the plaintiff’s testimony it would have concluded that he owed no income taxes for any of the years in question. It obviously did not believe his testimony. But instead of disregarding it as unworthy of belief, it merely discounted it by some two-thirds.
*11 I see no reason for this treatment of the case. I think that, as the proof stands, and regardless of presumptions of correctness, and burdens of proof, the only trustworthy evidence supports the assessments made by the Commissioner of Internal Revenue. If the real facts are otherwise, our lack of knowledge of them is due to the refusal of the plaintiff to enlighten us.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is an unmarried resident of Memphis, Tennessee. He was born in Nashville, Tennessee, on December 23, 1894. He married in 1927 and lived with his wife until 1938. He and his wife were divorced in 1940. One son, Jerome, was born to the couple in 1929.
2. During the taxable years involved in this suit, and prior thereto, plaintiff filed his individual income tax returns on the cash receipts and disbursement basis of accounting. The books and records of the Jacobs Furniture Company from 1941 until the date of sale of that business were kept on the installment sales basis of accounting and on the basis of a fiscal year ending October 31st. During the years involved, plaintiff filed his individual income tax returns on said fiscal year basis and included therein the income of the furniture company until July 16, 1945. On that date, the business was sold for its then book value of $86,979.27. The purchase price was paid half in cash and half in notes which were paid off within two years. On the same date, plaintiff sold the lease on the business premises for $15,000, payable in monthly installments of $306.12.
3. Plaintiff filed no Federal income tax returns for the calendar years 1918 to 1923, inclusive. For the calendar year 1924, he filed a return showing no tax due, but deficiency assessments of $4.85 and $5.89 were subsequently made and paid. That total would be the tax on a net income of approximately $2,500. Plaintiff filed no income tax returns for 1925, 1930, and 1931. For the years 1926, 1927, 1928, 1929, 1932, *12 1933, 1934, 1935, 1936, 1937, 1938, and 1939, plaintiff filed individual Federal income tax returns showing annual income in such small amounts that no taxes were due. The returns were accepted by the Collector of Internal Revenue for the District of Tennessee as filed.
4. For the calendar year 1940, plaintiff filed a Federal income tax return disclosing tax due of $360.59, but an amended return for that year disclosed additional income tax due of $83.51, plus interest of $3.49. Subsequently, a further additional assessment was made against plaintiff of $237.37, plus interest of $23.93. All of the above amounts were duly paid.
5. Having received permission to change to a fiscal-year basis, plaintiff filed his individual income tax return for the fiscal period beginning January 1,1941, and ending October 31,1941, showing total tax due of $308.91, which amount was paid. An additional assessment for the fiscal period ended October 31, 1941, in the amount of $2,057.99, plus interest of $104.59, was subsequently made and was paid on December 2,1942.
6. Plaintiff duly filed his income tax return for the fiscal year ended October 31, 1942, disclosing $4,842.54 taxes due, which amount was paid. An additional assessment for the fiscal year 1942 was made in the amount of $379.08, plus interest of $54.56. The additional assessment was paid on June 16,1945.
7. Plaintiff duly filed his individual income tax return for the fiscal year ended October 31, 1943, showing total tax due of $5,686.50. The amount shown due for the fiscal year 1943 was abated under the forgiveness features of the Current Tax Payment Act of 1943, and was treated as part of the taxes assessed for the fiscal year ended October 31, 1944. The amount of plaintiff’s net income for the years 1918 through 1943 is not in evidence, with the exception of the year 1924.
8. For the fiscal year ended October 31, 1944, plaintiff filed an individual income and victory tax return with the Collector of Internal Revenue for the District of Tennessee on December 30, 1944. The return showed victory tax net *13 income of $13,608.19, income tax net income of $13,155.33, and after making adjustments for the forgiveness features of the Current Tax Payment Act of 1943, total taxes due of $6,632.68. The latter amount was paid on or before January 2.1945.
9. For the fiscal year ended October 31, 1945, plaintiff filed an individual income tax return with the Collector of Internal Revenue for the District of Tennessee on November 19.1945. The return showed total income of $33,112.01 and total taxes due of $14,900.64, computed under the so-called “alternative” method. The total tax shown due was paid to the Collector on or before November 18,1945.
10. From November 1,1940, to the fiscal year ended October 31, 1945, plaintiff included the income of Jacobs Furniture Company, his individually owned furniture store, in his individual income tax returns.
11. For the fiscal year ended October 31, 1946, plaintiff filed an individual income tax return with the Collector of Internal Revenue for the District of Tennessee on December 30.1946. The return showed total income of $10,059.26 and total tax due of $1,918.60. The latter amount was paid on or before December 30, 1946.
12. For the fiscal year ended October 31, 1947, plaintiff filed an individual income tax return with the Collector of Internal Revenue for the District of Tennessee on November 21.1947. The return showed total income of $8,809.90 and income tax due thereon of $1,350.74. The latter amount was paid to the Collector on or before November 21, 1947.
13. By a statutory notice of deficiency dated June 28,1949, the Commissioner of Internal Revenue asserted deficiencies in income tax and penalties against the plaintiff as follows:

*14 In explanation of tbe deficiencies, the Commissioner of Internal Revenue stated:
It is held that you are liable for the negligence penalty of 5% of the deficiencies under the provisions of Section 293 (a), Internal Revenue Code.
With respect to the deficiencies proposed for each of the years involved, the Commissioner further stated:
It has been determined on a net worth basis, that you realized taxable income during this year in the amount of * * * in excess of the income reported on your return.
14. For the fiscal year 1944, the Commissioner found unreported income on the net worth basis of $86,496.48; for the fiscal year 1945, $136,608.05; for the fiscal year 1946, $59,240.96, and for the fiscal year 1947, $21,158.20. The penalties proposed for assessment were negligence penalties of 5 percent of the deficiencies under the provisions of Section 293 (a) of the Internal Revenue Code.
15. On June 28, 1949, there was transmitted to plaintiff a report of, examination of Internal Revenue Agent Cameron D. Huddlestone of the tax returns of the plaintiff for the years ended October 31, 1944, October 31, 1945, October 31, 1946, and October 31,1947, and said report set forth the same additional taxes and negligence penalties as appeared in the statutory notice of deficiency referred to in Finding 14. In the report the revenue agent stated that “the principal change in tax liability is due to the addition of income from unexplained sources.” He recommended assessment of the 5 percent negligence penalties under Section 293 (a) of the Internal Revenue Code, and for the fiscal year 1944 he recommended assessment of the principal tax deficiency under the provisions of Section 275 (c) of the Internal Revenue Code. He made the income computations for the fiscal years involved on the Net Worth and Expenditures basis and set up complete detailed charts showing plaintiff’s increasing bank balances, both commercial accounts and savings accounts, securities, real estate, and other assets. He computed plaintiff’s net worth on the basis of all visible assets, minus liabilities, at $123,298.76 on October 31,1943; $198,595.84 on October 31, 1944; $359,008.62 on October 31, 1945; $409,- *15 188.24 on October 31, 1946, and $430,141.50 on October 31, 1947. The detailed net worth statements were as follows:
Saul B. Jacobs, Memphis, Term., net worth statement, period Oct SI, 1948, to Oct. 81, 1947
SCHEDULE 2

*16 16. In computing plaintiff’s taxable net income for tbe fiscal year ended October 31,1944, prior to' deducting plaintiff’s personal exemption, credit for dependents, exempt income, and earned income credit, tbe revenue agent added to plaintiff’s increase in visible net worth during that fiscal year ($75,297.08) plaintiff’s estimated living expenses of $5,000, bis known life insurance premiums paid, his individual income taxes paid, and a small amount paid for tbe support of bis son, an aggregate amount of $24,354.73. Tbe agent thus determined plaintiff’s taxable net income for tbe fiscal year ended October 31,1944, as $99,651.81, upon which the fiscal year tax liability was computed at $69,121.62' at 1944 income tax rates. Since plaintiff had reported a tax liability of $6,632.68, tbe actual deficiency in income taxes due for tbe fiscal year was determined as $63,681.13, upon which a 5-percent penalty of $3,184.06 was also recommended.
17. In computing plaintiff’s taxable net income for tbe fiscal year ended October 31, 1945, prior to deducting plaintiff’s personal exemption, credit for dependents, exempt income, and tbe excess of net long-term capital gains over net short-term capital losses, tbe revenue agent added to the plaintiff’s increase in visible net worth during that fiscal year ($160,412.78) plaintiff’s estimated living expenses of $5,000, bis known life insurance premiums paid, his individual income taxes paid, and a small amount paid for the support of his son, an aggregate amount of $10,138.15. The agent then deducted limitations on capital gains and losses, and nontaxable interest, in an amount of $1,645.51, with a resultant taxable net income for the fiscal year 1945 of $168,905.42, upon which the fiscal year tax liability was determined on the alternative basis as $132,567. Since plaintiff had reported a tax liability of $14,900.64, the actual deficiency in income taxes due for the fiscal year was determined as $117,666.36, upon which a 5-percent penalty of $5,883.32 was also recommended.
18. In computing plaintiff’s taxable net income for the fiscal year ended October 31, 1946, prior to deducting plaintiff’s personal exemption, credit for dependents, exempt income, and the excess of net long-term capital gains over net short-term capital losses, the revenue agent added to the *17 plaintiff’s increase in visible net worth, during that fiscal year ($50,179.62) plaintiff’s estimated living expenses of $5,000, his known life insurance premiums paid, his individual income taxes paid, and a small amount paid for the support of his son, an aggregate amount of $20,622.96. The agent then deducted limitations on capital gains and losses, and nontaxable interest, in an amount of $2,569.79, with a resultant taxable net income for the fiscal year 1946 of $68,232.79, upon which the fiscal year tax liability was determined on the alternative basis as $38,018.37. Since plaintiff had reported a tax liability of $1,918.60, the actual deficiency in income taxes due for the fiscal year was determined as $36,099.77, upon which a 5-percent penalty of $1,804.99 was also recommended.
19. In computing plaintiff’s taxable net income for the fiscal year ended October 31,1947, prior to deducting plaintiff’s personal exemption, credit for dependents, exempt income, and the excess of net long-term capital gains over net short-term capital losses, the revenue agent added to the plaintiff’s increase in visible net worth during that fiscal year ($20,953.26) his estimated living expenses of $5,000, known life insurance premiums paid, individual income taxes paid, and a small amount paid for the support of plaintiff’s son, an aggregate amount of $8,520.24. The agent then deducted limitations on capital gains and losses, and nontaxable interest, in an amount of $1,109.19, with a resultant taxable net income for the fiscal year 1947 of $28,364.31, upon which the fiscal year tax liability was determined as $11,006.58. Since plaintiff had reported a tax liability of $1,350.74, the actual deficiency in income taxes due for the fiscal year was determined as $9,655.84, upon which a 5-percent penalty of $482.79 was also recommended.
20. On June 28,1949, plaintiff was notified of a deficiency for the years 1944,1945, 1946, and 1947. The deficiency for the year 1944 was asserted on the basis of a deficiency in excess of 25 percent of the total tax due for that year in reliance on § 275 (c) of the Internal Bevenue Code of 1939. The deficiency for the year 1945 was claimed pursuant to a waiver, dated December 20,1948, extending the time for assessment until June 30, 1949. On October 13, 1949, there were as *18 sessed against plaintiff tlie following deficiencies in income taxes, penalties, and interest:

21. Plaintiff paid to the Collector of Internal Bevenue for the District of Tennessee the deficiencies in income taxes, penalties, and interest in the amounts and on the dates indicated as follows:

22. Plaintiff was born December 23, 1894, in Nashville, Tennessee. His parents moved to Grenada, Mississippi, in 1903. Plaintiff graduated from high school in Grenada in 1912 and thereafter attended a business school in Memphis for seven or eight months. Plaintiff also worked while attending school and he estimates he earned about $10 a week. In 1914 plaintiff returned to Grenada but returned the following year to Memphis when the whole family moved there. From the time of plaintiff’s graduation from business school until his induction into the Army, he was employed by a number of organizations, among them a lumber company paying from $90 to $100 per month and the St. Francis Levee Board at from $125 to $150 per month.
*19 23. After his Army service plaintiff worked for J. H. Mednikow in Memphis at $150 per month. Having spent from four to six months on that job, he was employed briefly by the Sailors Clothing Co. Early in 1920 he began to work for the Leo Kahn Furniture Company as an office man at a salary of $300 per month. Leo Kahn died in 1934. The following year plaintiff helped found and began working for the Jacobs Furniture Company, a corporation. Forty-seven of the corporation’s fifty shares were issued to plaintiff’s father and the latter testified he had put up some money for this venture. The plaintiff maintained, however, that he owned the business in fact from the very beginning. The corporation was dissolved in 1940 at which time the business became a sole proprietorship in plaintiff’s name. Plaintiff continued to operate the business until he sold it on July 16, 1945, for from $85,000 to $90,000.
24. Prior to his Army service plaintiff dealt in the commodity market to some extent. He also was buying second mortgage bonds. Sometime after he started to work for the Leo Kahn Furniture Company plaintiff resumed his activities in the commodity market. At about that time he also traded in stocks, diamonds, and mortgages. Subsequent to his marriage in 1927 plaintiff pulled out of the stock market. He did not reenter it until 1943 or 1944. As noted in finding 7 there is no evidence in the record on plaintiff’s income until the year 1944.
25. During the tax years here in question plaintiff had several known sources of income. He received the income from his furniture business until its sale in July 1945. He also .engaged in dealings on the security and commodity markets, principally through the firms of W. E. Kichmond & Co. and James E. Bennett & Co. His holdings in notes yielded interest which for the most part was collected through the bank. Plaintiff also received returns from the securities and other assets which he held during this time.
26. In connection with the operation of his furniture business, plaintiff maintained a complete set of business records inbound volumes, consisting of ledgers, check journals, cash journals, sales and collection journals, all of which are in evidence.
*20 27. The accounting firm of Seidman & Seidman prepared the Federal income tax returns of the plaintiff for all years here involved, namely, the fiscal years ended October 31,1944, October 31,1945, October 31,1946, and October 31,1947, and a representative of the accounting firm audited the books and records and made the closing entries that appear in all of the books and records of Jacobs Furniture Company.
28. The books and records of the furniture business were kept on the installment sales basis of accounting and the records reflecting the other business transactions of plaintiff were kept on the cash receipts and disbursements basis of accounting.
29. With respect to his transactions in stocks and commodities, plaintiff received from his brokers individual and specific purchase and sales advices in written form representing each transaction. Plaintiff also obtained at the end of each year from his brokers detailed statements in permanent journal form verifying each individual purchase and sale advice and reflecting all transactions for the year. These records were kept and preserved by plaintiff as his permanent records of his stock and commodity transactions and were turned over to his accountants at the time the Federal income tax returns were prepared.
30. With respect to the interest received by plaintiff, almost all of it was collected by the National Bank of Commerce in Memphis and the bank gave plaintiff a written collection advice reflecting the receipt of the interest. All of these collection advices were kept by plaintiff as his permanent records and were turned over by plaintiff to his accountants for use in preparing his Federal income tax returns.
31. Plaintiff did not transcribe into a book or books a record of the transaction evidenced by these written advices from his brokers and the banks.
32. After Revenue Agent Huddlestone’s report on his examination of plaintiff’s returns for the years ended October 31,1944, October 31,1945, October 31,1946, and October 31, 1947, was issued, the late F. E. Hagler, Esq., as attorney for plaintiff, employed Mr. Lucian Minor, a well-qualified certified public accountant, who did not know plaintiff, to make a comprehensive review of plaintiff’s financial transactions, *21 both business and personal, with instructions to make as thorough an investigation as possible regardless of the time involved and in the event that there was any doubt as to the taxability of any item to resolve such doubt against the plaintiff, and in the manner producing the most tax.
33. In the course of his investigation, Mr. Minor made a detailed analysis of all security and commodity transactions of plaintiff from October 31, 1943, to October 31, 1947. Minor scheduled by months and analyzed every deposit and disbursement of plaintiff’s bank accounts. A complete re-audit of the books of Jacobs Furniture Company was made. A thorough analysis was made of the collection advices provided by the National Bank of Commerce in Memphis, and Mr. Minor charged plaintiff with the receipt of interest in instances where there was a real doubt as to the receipt of such interest by plaintiff, in accordance with the instructions given by F. E. Hagler, Esq.
34. Mr. Minor’s investigation showed that, on the basis of information and records made available to him, plaintiff’s tax returns for the years in question had, with minor exceptions, stated his income correctly.
35. An additional investigation of plaintiff’s financial affairs was made by James B. Allen, certified public accountant of Nashville, Tennessee, and a former Internal Revenue Agent from 1927 to 1934. This investigation corroborated that of Mr. Minor.
36. The accountants’ investigation could not trace all of plaintiff’s financial transactions. Plaintiff had not retained or had lost some of his cancelled checks and in such cases disbursements from his bank accounts could not always be clearly identified. Furthermore, the accountants were unable to specifically state the source of certain deposits in plaintiff’s bank accounts. Mr. Minor estimated that from $250,000 to $275,000 of plaintiff’s bank deposits during this period could not be traced to payments made to the plaintiff by the Richmond and Bennett firms. Mr. Allen likewise was unable to determine the source of $296,000 cash deposits which plaintiff made during this time. He stated that his investigation did not find that these deposits were from income other than what plaintiff reported on his returns. *22 Plaintiff did not furnish his accountants with records which purported to give a complete account of all his cash transactions.
37. The evidence on plaintiff’s net worth is not precise. In 1918, when plaintiff entered the Army, he turned over to his mother for safekeeping between $75,000 and $90,000 in cash. In addition, he kept a bank balance of $10,000. Plaintiff testified his net worth in 1927 was a little more than $300,000. He further testified that, as of October 31, 1943, he had cash (currency, cashier’s checks, New York exchange, St. Louis exchange), or “the equivalent of cash, stocks,” worth over $400,000. He did not include the value of his business in this figure.
38. There are in evidence two statements of net worth as of October 31, 1943, and October 31, 1944, which plaintiff furnished his bank. The 1943 statement lists, under the heading of “Bonds-notes etc.,” assets worth $50,000. The 1944 statement lists, under the heading of “Bonds-etc.,” assets in the amount of $87,000. The statements were submitted on stationery of the Jacobs Furniture Company and plaintiff claims they were intended to cover merely the worth of his business and not of himself personally. Plaintiff testified that he included sufficient personal assets in these statements to insure what he said was their purpose, obtaining of a line of credit. He said he wished to show that the business was solvent but did not make any effort to list everything he owned.
39. Plaintiff testified that he had made lists of his assets but that he no longer had any of these lists. He also testified that his $300,000 net worth in 1927 was partly in cash and partly in securities. Plaintiff at about that time showed a portfolio of securities to his friend Mr. Weiss who estimated, on deposition, they were worth from $150,000 to $200,000. Plaintiff himself estimated the contents of this portfolio as having had a value of from $100,000 to $150,000 but added it represented only a part of his holdings at that time. He could not recall what part of the securities in that portfolio were stock, what type of stock, or when he sold the stock.
*23 40. Plaintiff was unable to give a breakdown between cash and stock in the $400,000 which he said he held in those two assets in 1943. He kept these assets in his stoi*e, at home, on his person, and in a vault. He has always had a lockbox since being grown up. He was unable to state how much money he had in his lockbox on October 31, 1943, nor how much money he had in his lockbox or lockboxes on October 31, 1944. He estimated that he customarily kept $100,000 either in his money belt or at home.
41. Certain of plaintiff’s business transactions indicate that he had a considerable amount of cash or readily available credit. In 1934, he made an offer to pay $75,000 cash for an interest in the Leo Kahn Furniture Company. In 1942, he made an offer to purchase a certain piece of real estate in Memphis for $175,000 cash. During the years 1939-1946 plaintiff made loans ranging from $5,000 to $50,000 to Mr. Edgar Haas, a personal friend. These loans were made in cash, cashier’s checks, and New York exchange, which plaintiff had on his person or on his premises.
42. The records of his brokers for the fiscal years here in question show that he transacted a very substantial part of his business there in cash or by redeposit of checks he received from the broker. During these same years plaintiff deposited $296,000 in cash to his bank accounts. Becords submitted by two Memphis banks, approximately covering the period 1940-1947, show that plaintiff made frequent purchases there of cashier’s checks and New York exchange, payable to Saul B. Jacobs, in amounts that ranged from $63.50 to $35,000. Where the records list the date of payment, they indicate that payment in every case occurred within a year after the date of issuance.
43. On the other hand, one of plaintiff’s bankers testified that plaintiff has borrowed money over the years and heavily around 1946. He borrowed as much as $50,000 in 1943 and 1944. Sometimes he would borrow on open account and when he borrowed as much as $25,000 he would put up collateral.
44. When plaintiff was divorced in 1940, his father and mother paid off an $1,800 lien on a parcel of real property *24 held by plaintiff and his former wife. His parents also gave $6,000 in addition for the divorce settlement and signed out some of their property for a $5,000 bond to assure support of plaintiff’s child. From the deposition of plaintiff’s father it appears that plaintiff had told his father that he (the plaintiff) had been advised by his lawyers to borrow the money for the settlement. Plaintiff denied that his parents gave the money for the divorce settlement. He testified that he had had to get the impression over that he did not have anything in order to get his divorce and that he himself actually gave the money for the settlement.
45. Plaintiff’s wealth is attributable to various sources. In view of some evidence tending to show plaintiff’s frugal habits, a part undoubtedly represents savings from his income over the years. The amount of his income prior to 1948 has not been shown.
46. Another part represents gifts from his parents. His parents were immigrants who worked hard, lived frugally, and saved their money. They thus accumulated considerable wealth. They owned a business and valuable realty in Memphis. Plaintiff testified his parents kept substantial amounts of money in hiding places in their home. They rented several lockboxes, one at least as early as 1927. Plaintiff had authority to enter the lockbox his mother rented at the National Bank of Commerce in 1945. Some of plaintiff’s accounts with his brokers were in his parents’ name, as were some of his bonds.
47. Plaintiff’s parents made him gifts of money at various times throughout his life. During plaintiff’s childhood his parents would lay aside some money for plaintiff without, however, relinquishing posssession. Other money was given to him directly at that time. Plaintiff received at birth $1,000 from his mother and $2,000 from his father; at the age of thirteen he received $4,000 from each parent; at the time of his graduation from high school he received $5,000 from each parent. He received other substantial amounts in his early years. By 1918, plaintiff estimated that of the money he left with his mother for safekeeping, $25,000 represented gifts from his parents. By 1927, he estimated he had been given over $200,000. Large gifts stopped *25 between 1927 and 1938. During the years 1944 through 1947 there were no large gifts to plaintiff from his parents. Plaintiff’s father estimated that he and his wife had given plaintiff from $120,000 to $140,000 by 1944. He estimated that each parent gave plaintiff $10,000 during the period 1932-1945.
48. There was no evidence on whether or not plaintiff’s father or mother ever filed a gift tax return, although plaintiff’s father did say he did not know whether such a return was filed. Neither plaintiff’s father nor his mother kept an account or record of the gifts they made to him. There is no evidence whether or not plaintiff kept any record of these gifts.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that he recover of and from the United States eighty-six thousand ninety-seven dollars and eighty-seven cents ($86,097.87) with interest as provided by law.